## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

**LEONA SHANKS,** *administratrix of the*   :
*Estate of Nelson Shanks*               :        **CIVIL ACTION**
             *Plaintiff,*            :
                                :
      **v.**                          :        **No. 18-4042**
**LARRY HALL,** *et al.*           :
                                :
            *Defendants.*         :

## MEMORANDUM

## I. BACKGROUND

The Complaint alleges that Decedent Nelson Shanks ("Shanks") was granted

permission by the Vatican in 2002 to paint a portrait of Pope John Paul II (the

"Portrait"), which he completed in September 2002. ECF No. 1, Exhibit D at ¶ 9.

That same year, Shanks met Anne Hall[1] at an art workshop in Miami, Florida. *Id.*

at ¶ 14. When Anne Hall met Shanks, she told him that she wanted to attend the

art school that he founded, Studio Incamminati, but that she had nowhere to live in

Pennsylvania where the school was located. *Id.* at ¶ 15. Shanks offered to have

Anne Hall and her husband, Larry Hall, stay at his home so that she could attend

the art school. *Id.* at ¶ 16. Anne Hall stayed at Shanks's home for over a year, and

---

[1] Anne Hall was listed as a defendant in the Complaint, however the parties stipulated to
voluntarily dismiss her from this matter on March 4, 2019. *See* ECF No. 22.

1

her husband often traveled to Pennsylvania and stayed there as well. *Id.* at ¶ 17. Anne and Larry Hall became close with Shanks and "bec[a]m[e] a close part of his inner circle." *Id.* at ¶ 18.

The Complaint alleges that Anne and Larry Hall "spent many days and nights with Nelson Shanks, praising him and his work and seemingly assisting at" his art school. *Id.* at ¶ 19. The Complaint alleges that Anne and Larry Hall often spoke to Shanks about the Portrait and the difficulty he had coming to an agreement with the Vatican to display the Portrait at the Vatican Museum, during which they shared wine, "which they knew he enjoyed." *Id.* at ¶¶ 20-21. During that time, Anne and Larry Hall suggested that they could "become caretakers of the" Portrait, and act "as a public face for the [Portrait], appearing as art investors who could arrange for a permanent home for the Portrait at the Vatican or some other highly reputable museum where the Portrait could be appreciated by the world." *Id.* at ¶ 22. The Complaint alleges that Anne and Larry Hall attempted to convince Shanks that the best way to have the Portrait displayed in a highly-reputable museum was to "have a third party (them) appear to own the Portrait and as the 'owner' could then arrange for the sale of the painting, with the proceeds of any such sale being given to Mr. Shanks." *Id.* at ¶ 23. At this time, "Shanks was in need of money," which Anne and Larry Hall knew. *Id.* at ¶ 24.

In September 2003, Anne and Larry Hall formed Art Heritage Holdings,

2

LLC ("AHH") "for the purpose of becoming the caretaker and public face of the Portrait." *Id.* at ¶ 25. "The sole purpose of the creation of AHH was to maintain custody of the Portrait and to attempt to arrange for a permanent home for the Portrait in a museum of the highest order." *Id.* at ¶ 26. Anne and Larry Hall "repeatedly represented that AHH taking custody of the Portrait and appearing to be the owner was a favor that the Halls were willing to do for Mr. Shanks because of their love and appreciation for his friendship and talents." *Id.* at ¶ 27. Therefore, the Complaint alleges, the price that Anne and Larry Hall agreed to pay for the Portrait, $170,000, was "significantly less than the appraised value." *Id.* at ¶ 28. Anne and Larry Hall then consulted an attorney to create AHH and had their attorney draft a contract "for custody of the Portrait." *Id.* at ¶ 29.

The Complaint alleges that Anne and Larry Hall "urgently faxed [the contract] to Mr. Shanks on the evening of September 22, 2003, pressuring him to sign it immediately," as Larry Hall had to leave for the airport. *Id.* at ¶ 30. Later that night, at 10:56 p.m., Larry Hall sent another fax "imploring Mr. Shanks to sign the agreement." *Id.* at ¶ 31.

The Complaint alleges that although Shanks "did not often deal in legal documents and was not normally one to place agreements into formal contracts," Shanks, "[w]ithout seeking advice of counsel or any other party . . . signed the contract [the '2003 Agreement'] with AHH on or about September 24, 2003." *Id.*

3

at ¶¶ 32-33. The Complaint alleges, "[u]nder the terms of the written [2003 Agreement] and contrary to the specific discussions and intent of the parties, AHH became owner of the painting and purchased the painting, which had been valued at $500,000.00 for $170,000.00." *Id.* at ¶ 34. The Complaint alleges, however, that "it was the intent of the parties that the Halls have AHH only appear to be the owner of the Portrait for the purposes of arranging for the Portrait to be displayed in a museum of the highest order, which was why the price of the portrait was so much lower than its actual appraised price at the time." *Id.* at ¶ 35. The Complaint alleges that Shanks "[a]lmost immediately" realized that the 2003 Agreement "did not contain the full and complete terms of the agreement between the parties," and he therefore contacted Anne and Larry Hall via letter on December 15, 2003, about three months after Shanks signed the Contract, "seeking to clarify the terms of the agreement regarding the custody of the Portrait." *Id.* at ¶ 36. The Complaint alleges Larry Hall responded via letter on January 15, 2004, where he "agreed with Mr. Shanks about the terms of the [2003 Agreement], and repeatedly affirmed in writing that the purpose of creating AHH was to . . . 'take care of the [Portrait] . . . until it reached a final resting place . . . .'" *Id.* at ¶ 37.

From 2004 to 2015, Anne and Larry Hall "maintained possession of the Portrait and acted as the ostensible owners" and regularly stayed in contact with Shanks regarding the Portrait and its potential final resting place. *Id.* at ¶¶ 39-40.

4

During that time, "the Portrait was exhibited approximately 11 times in museums of the highest order or with exhibitions of Mr. Shanks' work all over the world, with the full cooperation of the Halls." *Id.* at ¶ 41. The Portrait was valued for insurance purposes at each of these exhibitions at $500,000 in 2003 and at $2.5 million in 2015. *Id.* at ¶ 42. When certain opportunities to sell the Portrait came to Shanks's attention, Anne and Larry Hall notified Shanks that it was not the right time to sell or the buyer was not the proper person to accomplish the goal of ensuring that the Portrait ended up in a reputable museum. *Id.* at ¶ 43.

In July 2015, Shanks's representative contacted Anne and Larry Hall to inform them that the Vatican and local Catholic Church offered to display the Portrait at the Cathedral Basilica of Saints Peter and Paul during the World Meeting of Families ("WMOF"), at which Pope Francis would be present. *Id.* at ¶¶ 45-47. Anne and Larry Hall were "overjoyed," stated "they would cooperate and do everything in their power" to help, and began working with the Archdiocese of Philadelphia to have the Portrait displayed. *Id.* at ¶¶ 48-49.

In mid-August 2015, however, the Archdiocese refused to display the Portrait at the WMOF because Defendants did not have the Portrait insured for display at the WMOF and the Archdiocese could not afford the cost of insurance and transport of the Portrait (approximately $4,875). *Id.* at ¶ 52. Shanks was upset that the Portrait was uninsured and that it was not displayed at the WMOF. *Id.* at ¶

5

53. Shanks expressed his "outrage" in an email on August 19, 2015 to Larry Hall, stating that Larry Hall "was to act as an 'agent' to secure the [Portrait] to its proper home," and that Larry Hall was not putting the best interests of the Portrait first, but focusing instead on the valuation of the painting. *Id.* at ¶ 53. Neither Anne nor Larry Hall responded to the email, and nine days later Shanks passed away. *Id.* at ¶¶ 54-55.

The Complaint alleges that since August 2015, Anne and Larry Hall have not arranged for the Portrait's exhibition or attempted to find a permanent home for the Portrait and instead have kept the Portrait crated and warehoused for years, "in violation of the contractual terms and duties owed by the Halls and AHH to the Estate of Nelson Shanks." *Id.* at ¶ 57.

Plaintiff alleges that the Defendants and Shanks entered into a legally binding agreement for Defendants to become caretakers of the Portrait and ensure that the Portrait was "sold to someone who could guarantee that the Portrait would be displayed in the Vatican Museum or another museum of the highest order." *Id.* at ¶ 57. Only "[s]ome of the terms of [this] agreement were reduced to writing" in the 2003 Agreement, "which was lawfully modified and clarified by written communications by and between the parties that occurred in December 2003 and January 2004." *Id.* at ¶ 60. The terms of this agreement were "certain, distinct, free from ambiguity, and clearly understood by all the parties." *Id.* at 61. Plaintiff

6

alleges that it was "[e]xplicit and implicit in th[e] agreement [that] the Halls would abide by the covenant of good faith and fair dealing and would cooperate with exhibiting the Portrait in appropriate settings to maximize the attention to and value of the Portrait, to further the ultimate goal of ensuring the painting a final resting place in a museum of the highest order" though there was "no set specific timetable . . . for the Portrait to end up in its final resting place." *Id.* at ¶¶ 63, 64.

Anne and Larry Hall maintained contact with Shanks regarding the Portrait for 10 years, and during this time "the Portrait was displayed at exhibitions and museums of the highest order." *Id.* at ¶¶ 65, 66. However, the Complaint alleges that Defendants' failure to have the Portrait exhibited at the WMOF, which it describes as "scuttl[ing] the once in a lifetime opportunity," was a failure to "act[] in good faith to further the interests agreed by the parties." *Id.* at ¶ 67.[2] The Complaint alleges that since Shanks's death in August 2015, Plaintiff has made several attempts to contact the Defendants regarding "their attempts to satisfy the terms of their agreement and find a final resting place for the Portrait," but Defendants have been "non responsive to all attempts to determine the location of the painting and whether any progress has been made" in finding the Portrait a final resting place. *Id* at ¶ 68.[3]

---

[2] The Complaint incorrectly labels this paragraph as ¶ 63.
[3] The Complaint incorrectly labels this paragraph as ¶ 64.

## II. STANDARD

When reviewing a motion to dismiss, the Court "accept[s] as true all allegations in plaintiff's complaint as well as all reasonable inferences that can be drawn from them, and [the court] construes them in a light most favorable to the non-movant." *Tatis v. Allied Interstate, LLC*, 882 F.3d 422, 426 (3d Cir. 2018) (quoting *Sheridan v. NGK Metals Corp.*, 609 F.3d 239, 262 n.27 (3d Cir. 2010)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly*, 550 U.S. at 557, 127 S. Ct. 1955)). "The plausibility determination is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786-87 (3d Cir. 2016) (quoting *Iqbal*, 556 U.S. at 679).

Finally, courts reviewing the sufficiency of a complaint must engage in a three-step process. First, the court "must 'take note of the elements [the] plaintiff must plead to state a claim.'" *Id.* at 787 (alterations in original) (quoting *Iqbal*, 556 U.S. at 675). "Second, [the court] should identify allegations that, 'because

8

they are no more than conclusions, are not entitled to the assumption of truth.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679). Third, "'[w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.'" *Id.* (alterations in original) (quoting *Iqbal*, 556 U.S. at 679).

## III. DISCUSSION

Defendants move to dismiss Plaintiff's Complaint, asserting that the terms of the 2003 Agreement are unambiguous and that the Complaint does not state a claim for breach of that unambiguous 2003 Agreement. ECF No. 6 at 8. Defendants contend that Plaintiff seeks to improperly alter the terms of the 2003 Agreement based on letters between the parties, which were sent months after the 2003 Agreement was finalized, to hold Defendants responsible for certain obligations that were not agreed upon in the 2003 Agreement. *Id.* Defendants assert that there was no contractual obligation of AHH under the 2003 Agreement to find a permanent home for the Portrait in a museum, and therefore Defendants cannot be liable for breach. *Id.* at 9. Lastly, Defendants argue that this Court lacks personal jurisdiction over AHH because it has not had sufficient contact with the forum to support the exercise of personal jurisdiction over it. *Id.*

Plaintiff responds that the 2003 Agreement contains "inconsistencies in language and ambiguity" and is unclear as to the "ultimate purpose" of the parties'

9

agreement, thus requiring the Court consider the two "written instruments" sent

months later, which Plaintiff claims clarify the true intent of the agreement. ECF

No. 8 at 7, 18  Plaintiff argues that all "three documents [together] evidence the

oral agreement entered into between the parties." *Id.* at 18. According to Plaintiff,

the actual agreement was for Defendants to only *appear* to become the owners of

the Portrait by purchasing it for $170,000, but they were instead contractually

obligated to find a suitable home in a museum for the Portrait. *Id.* at 7. Plaintiff

argues that Defendants showed they had "little to no desire to adhere to their end of

the bargain" in failing to find a suitable home in a museum for the Portrait and in

"rarely permitt[ing] the Portrait to even be exhibited," and because of this are in

breach of the 2003 Agreement. *Id.*

Plaintiff next argues that if the Court determines the 2003 Agreement was

unambiguous, it should still consider parole evidence because this type of evidence

is admissible under Georgia contract law "where such terms were omitted by fraud

or mutual mistake," which it claims has occurred here. *Id.* at 21. Lastly, Plaintiff

contends that this Court does have personal jurisdiction over Defendants because

Defendants purposefully directed their activities at Pennsylvania and the litigation

arises out of and is related to Defendants' activities in Pennsylvania. *Id.* at 27.

## A. **Breach of Contract**

The Court must determine, first, whether the 2003 Agreement is ambiguous,

10

so that the Court can decide whether to consider parole evidence in explaining that ambiguity, and second, whether Defendants breached the 2003 Agreement.

### 1. The 2003 Agreement is unambiguous.

Under Georgia law,[4] contract construction is a three-step process:

> First, the trial court must decide whether the language is clear and unambiguous. **If it is, the court simply enforces the contract according to its clear terms; the contract alone is looked to for its meaning**. Next, if the contract is ambiguous in some respect, the court must apply the rules of contract construction to resolve the ambiguity. Finally, if the ambiguity remains after applying the rules of construction, the issue of what the ambiguous language means and what the parties intended must be resolved by a jury.

*City of Baldwin v. Woodard & Curran, Inc.*, 743 S.E.2d 381, 389 (2013)

(emphasis added) (quoting *Record Town, Inc. v. Sugarloaf Mills Ltd. Partnership of Ga.*, 687 S.E.2d 640 (2009)). "Where there is no ambiguity, parol evidence will not be permitted to alter the terms of the agreement." *Tomberlin Assocs., Architects, Inc. v. Athens Bank & Tr.*, 313 S.E.2d 137, 138 (1984). Furthermore, "[n]o construction is required or even permissible when the language employed by the parties in their contract is plain, unambiguous, and capable of only one reasonable interpretation. In such instances, the language used must be afforded its literal meaning and plain ordinary words given their usual significance." *Id.* (quoting *Porter Coatings v. Stein Steel, etc., Co.*, 157 Ga.App. 260, 262 (1981)).

---

[4] Both parties agree that Georgia law applies. ECF No. 6 at 16; ECF No. 8 at 16 n. 3.

"A valid, written contract which is complete, and the terms of which are not ambiguous, can not be contradicted, added to, altered, or varied by parol agreements." *S. & S. Builders, Inc. v. Equitable Inv. Corp.*, 219 Ga. 557, 561, 134 S.E.2d 777, 780 (1964). Therefore, if the Court determines the 2003 Agreement is unambiguous, the Court will afford the agreement its literal meaning and will not consider any other evidence in determining that literal meaning.

Plaintiff's primary cause of action in the Complaint is that Defendants breached the 2003 Agreement by failing to find a suitable home for the Portrait in a museum of "the highest order" and rarely permitting the Portrait to be exhibited, specifically at the WMOF in August 2015. *See generally* ECF No. 1, Exhibit D. Plaintiff admits that the requirement that Defendants find a suitable home for the Portrait in a museum is not explicitly stated in the 2003 Agreement but claims the Court should consider two communications sent after the 2003 Agreement was signed that allegedly clarify the 2003 Agreement. ECF No. 8 at 17-18. Plaintiff contends that the Court may consider this parol evidence because the 2003 Agreement is ambiguous. *Id.* Plaintiff argues the 2003 Agreement is ambiguous because it states,

"[t]he Artist agrees to sell the Portrait with all other property rights or interests therein and, without limiting the generality of the foregoing, the reproduction rights as described below to the Purchaser . . . Clear legal title shall pass to the Purchaser at such time as full payment is received by the Artist,"

but then states on page two,

"[t]he Purchaser understands that the Artist wishes that the Portrait be available for exhibition to the public and to appear on exhibition with other works of art by the Artist from time to time at no expense to the Purchaser. The Purchaser will strongly consider any such requests from the Artist and availability of the Portrait will not be unreasonably withheld."

ECF No. 8-2 at 24; ECF No. 23 at 23:7-24:12. Plaintiff contends that there is a "discrepancy" because the 2003 Agreement "can't have [AHH] being full owners, and then, at the same time, say[] [AHH is] going to listen to what the owner has to say," with respect to the Portrait being on exhibition. ECF No. 23 at 24:2-6.

The Court disagrees with Plaintiff and finds that the language of the 2003 Agreement is unambiguous and capable of only one reasonable interpretation. AHH purchased the Portrait for $170,000 and was required to "strongly consider" requests by Shanks for its exhibition, but these exhibitions were to be "at no expense to" AHH. ECF No. 8-2 at 24. The 2003 Agreement explicitly states that Shanks "has created and wishes to sell the Portrait" and that AHH "wishes to purchase it." *Id.* at 23. The 2003 Agreement states that Shanks "agrees to sell the Portrait . . . for the agreed upon price of $170,000" and that "[c]lear legal title shall pass to the Purchaser at such time as full payment is received by the Artist." *Id.* The 2003 Agreement further states that AHH "understands that [Shanks] wishes that the Portrait be available for exhibition to the public and to appear on

13

exhibition with other works of art by [Shanks] from time to time <u>at no expense to</u>

<u>the Purchaser</u> . . . [and that AHH] will strongly consider any such requests from

[Shanks] and availability of the Portrait will not be unreasonably withheld." ECF

No. 8-2 at 24.

It is not ambiguous that the 2003 Agreement provides AHH with clear legal

title to the Portrait and yet requires AHH to "strongly consider" requests by Shanks

to exhibit the Portrait to the public "at no expense to" AHH. Therefore, the Court

may not consider any outside evidence to alter or "clarify" the terms of the 2003

Agreement.[5]

---

[5] Plaintiff additionally claims that, even if the Court finds the 2003 Agreement unambiguous, "parole evidence of the later communications between the parties which define the terms of their agreement can still [be] admissible in the cases where such terms were omitted by fraud or mutual mistake." ECF No. 8 at 21. Plaintiff argues that the 2003 Agreement failed to include material terms that were agreed upon by the parties "whether by fraud or by mistake of the parties," and "Georgia law permits contracts to be reformed by parol evidence in the case of fraud or mutual mistake." *Id.* (citing *Green v. Johnson*, 113 S.E. 402, 407-408 (Ga. 1922)). However, Plaintiff admits that "it is not clear if Defendants' attorney fraudulently, intentionally or mistakenly omitted the central terms of the agreement by failing to include that Defendants would be owners in name only and would actually be caretakers of the Portrait[] for the purpose of finding a permanent home for the Portrait," but claims that "parol evidence is permitted to establish the intent of the parties." *Id.* at 21-22. Plaintiff reiterated at oral argument that the Complaint does "not [allege] a claim for fraud," but claims it did allege that "there was fraud involved[] in the drafting of this [C]omplaint, in that the Halls ingratiated themselves to a man[] who had an alcohol problem." ECF no. 23 at 32:11-13.

"Parol evidence is admissible to establish fraud in the inducement, even though there is an entirety or merger clause in the written contract, **where the complaining party** does not elect to stand on the contract but **proceeds on fraud**." *Judge v. Wellman*, 198 Ga. App. 782, 783 (1991) (emphasis added). Here, Plaintiff does not attempt to state a claim for fraud and therefore cannot introduce parol evidence to establish such fraud.

Furthermore, the Complaint does not show that there was any mutual mistake in the drafting of the 2003 Agreement, and the language in the 2003 Agreement states plainly that the contract was for sale of the Portrait. Even if the Court were to assume that there was a mutual mistake and considered the two communications as parol evidence of a mutually forgotten term

14

Furthermore, the 2003 Agreement explicitly states that it "constitutes the entire understanding between the parties," and "[i]ts terms can be modified only by an instrument in writing signed by both parties." ECF No. 8-2 at 24-25. To the extent Plaintiff argues that the two communications in December 2003 and January 2004 modify or "clarify" the intent of the 2003 Agreement, this directly contradicts the language of the 2003 Agreement, since neither letter constitutes "an instrument in writing signed by both parties." *Id.*

## 2. *The Complaint does not state a claim for breach of the 2003 Agreement.*

Having found that the 2003 Agreement is unambiguous, the Court must determine whether the Complaint states a claim for breach of the plain language of the 2003 Agreement. Plaintiff's only argument that Defendants breached the 2003

---

that should have been in the 2003 Agreement, the term requiring Defendants to find a permanent home for the Portrait would be unenforceable because of vagueness. "The test in Georgia to determine whether a contract is unenforceable because of vagueness is" where the contract does not "contain[] matter which will enable the courts, under proper rules of construction, to ascertain the terms and conditions on which the parties intended to bind themselves." *Davidson Mineral Properties, Inc. v. Baird*, 390 S.E.2d 33, 38 (1990). The parties do not specify a clear time limit by which Defendants were supposed to sell the Portrait, nor any specific actions Defendants needed to take to effectuate this goal, especially considering Defendants could not guarantee that they would be able to place the Portrait in a museum of the "highest order" or sell it to someone who could. Furthermore, the Complaint alleges that Defendants had the Portrait displayed 11 times from 2004-2015 and diligently updated Shanks regarding the status of the Portrait for 10 years. ECF No. 1, Exhibit D at ¶¶ 40-41. Therefore, this Court does not find that Plaintiff has stated a claim for either mutual mistake or fraud that would allow this Court to consider parol evidence.

15

Agreement is that they failed to "cooperate with exhibiting the Portrait in appropriate settings to maximize the attention to and value of the Portrait," and also failed to "ensur[e] the [Portrait] a final resting place in a museum of the highest order." ECF No. 8-2 at 14. The 2003 Agreement is unambiguous in requiring Defendant AHH "strongly consider" all requests for exhibition by Shanks but also states that the exhibitions will be "at no expense to the Purchaser." ECF No. 8-2 at 24. The Complaint alleges that the potential August 2015 exhibition at the WMOF would have cost $4,875 for insurance and transport of the Portrait, which the Archdiocese of Philadelphia "could not afford." ECF No. 1, Exhibit D at ¶ 52. For Defendant AHH to ensure the display of the Portrait at the WMOF, AHH would have been required to pay $4,875 for its display. Therefore, this was not an exhibition "at no expense" to AHH, and, based on the plain language of the 2003 Agreement, AHH was not required to pay this expense to have the Portrait displayed.[6]

Furthermore, there is nothing in the plain language of the 2003 Agreement requiring that Defendant AHH either "ensure that the Portrait was sold to someone

---

[6] Outside of the WMOF exhibition, Plaintiff has not pled that Defendants otherwise failed to strongly consider any requests by Shanks to exhibit the Portrait. The Complaint, in fact, states that from 2004 to 2015, "the Portrait was exhibited approximately 11 times in museums of the highest order or with exhibitions of Mr. Shanks' work all over the world, with the full cooperation of the Halls." ECF No. 1, Exhibit D at ¶ 41. Therefore, Plaintiff has not shown how Defendants breached the 2003 Agreement by failing to "cooperate with exhibiting the Portrait in appropriate settings to maximize the attention to and value of the Portrait." ECF No. 8-2 at 14.

who could guarantee that the Portrait would be displayed in the Vatican Museum or another museum of the highest order," or that Defendant AHH itself "ensur[e] the Portrait would find its final resting place in a museum of the highest order." ECF No. 1, Exhibit D at ¶¶ 59, 62.[7] Therefore, Plaintiff's claim that Defendant AHH failed to sell the painting to another who could guarantee the Portrait would end up in a "museum of the highest order" or failed to donate it to such a museum itself does not state a claim for breach of the 2003 Agreement.

Plaintiff has therefore failed to state a claim for breach of contract against Defendants, and this claim must be dismissed.

## B. **Personal Jurisdiction**

Although the Court has found that Plaintiff failed to state a claim against Defendants for breach of contract, the Court will address Defendants' arguments regarding personal jurisdiction over AHH.[8]  Defendants maintain that this Court does not have jurisdiction over Defendant AHH because AHH, a Georgia entity, did not maintain minimum contacts with Pennsylvania. Plaintiff contends that

---

[7] Plaintiff also admits there was "no set specific timetable . . . for the Portrait to end up in its final resting place, only an understanding that a good faith effort to achieve the agreed goals would be undertaken by the Halls and AHH." ECF No. 1, Exhibit D at ¶ 64. *See also supra* n. 5.

[8] Defendants also contend that Larry Hall should not be a party to this dispute because AHH signed the 2003 Agreement, and not Larry Hall personally. ECF No. 6 at 17. As the Court has found there was no breach, the Court need not address whether Larry Hall was properly joined as a defendant. Anne Hall was voluntarily dismissed as a defendant by stipulated order. ECF No. 22.

17

AHH "availed themselves of Pennsylvania during their stewardship of the painting and should therefore be held to have reasonably expected to be brought into Court in Pennsylvania as a result of their entering into an agreement concerning the Portrait." ECF No. 8 at 25.

"In order to be subject to personal jurisdiction, a defendant's conduct in connection with the forum state must be such that he may 'reasonably anticipate being haled into court there.'" *Gen. Elec. Co. v. Deutz AG*, 270 F.3d 144, 150 (3d Cir. 2001) (citing *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)). A court may have general or specific personal jurisdiction over a party. *Id.* "Specific jurisdiction is established when a non-resident defendant has 'purposefully directed' his activities at a resident of the forum and the injury arises from or is related to those activities." *Id.* (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)).

If the court determines that the defendant has purposefully directed his activities at the forum and the injury arises from or is related to those activities, "a court may consider whether the exercise of jurisdiction otherwise 'comport[s] with 'fair play and substantial justice.'" *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 317 (3d Cir. 2007) (internal citations omitted). "In contract cases, courts should inquire whether the defendant's contacts with the forum were instrumental in either the formation of the contract or its breach." *Id.*

18

Here, the Complaint alleges that Anne and Larry Hall lived or stayed with Shanks in Pennsylvania during the time they had discussions regarding the Portrait with Shanks, which eventually culminated in the 2003 Agreement. ECF No. 1, Exhibit D at ¶¶ 15-22. The Complaint further alleges that Defendants breached the 2003 Agreement when AHH failed to have the Portrait displayed at the WMOF in August 2015, which involved Defendants' communications with the Archdiocese of Philadelphia regarding the Portrait's exhibition in Philadelphia. *Id.* at ¶¶ 45-52.

In negotiating and finalizing the 2003 Agreement while living or staying with Shanks in Pennsylvania, Defendants did purposefully direct their activities at Pennsylvania. The claim at issue is whether Defendants breached the 2003 Agreement by failing to exhibit the Portrait at the WMOF, and therefore the litigation arises out of or relates to the creation and negotiation of the 2003 Agreement. Lastly, this Court finds that its exercise of personal jurisdiction over Defendants comports with fair play and substantial justice because Anne Hall met Shanks in Miami, sought out and attended Shanks's art school in Pennsylvania, and both Anne and Larry Hall lived or stayed with Shanks while discussing and ultimately negotiating a contract for the sale of the Portrait with Shanks in Pennsylvania. Defendants' contacts with this forum were instrumental in both the formation of the 2003 Agreement as well as its alleged breach, and this Court has personal jurisdiction over Defendants.

## IV. FUTILITY OF AMENDMENT

Because the Court has concluded that Plaintiff failed to state a claim for breach of contract against Defendant, the Court must decide whether to allow Plaintiff to amend the Complaint or dismiss with prejudice. "It is common practice of courts within this district to dismiss with prejudice claims that cannot be replead and to dismiss without prejudice claims that can be replead and for which leave to amend is granted." *United States v. Union Corp.*, 194 F.R.D. 223, 236 (E.D. Pa. 2000). "When a plaintiff does not seek leave to amend a deficient complaint after a defendant moves to dismiss it, the court must inform the plaintiff that he has leave to amend within a set period of time, unless amendment would be inequitable or futile." *Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002); *see also Reuben v. U.S. Airways Inc.*, 500 F. App'x 103, 105 (3d Cir. 2012) ("[C]ourts must provide the opportunity to amend a complaint that is subject to a Rule 12(b)(6) dismissal unless doing so would be inequitable or futile.").

At oral argument, Plaintiff's counsel stated he would request leave to amend the Complaint if the Motion to Dismiss were granted as to the existence of fraud in the signing of the 2003 Agreement, based on the parties' failure to include the term discussed previously and Plaintiff's allegations that Anne and Larry Hall "ingratiated" themselves with Shanks and that Shanks had an alcohol problem. *See* ECF No. 23, 20:10-17 ("And as we alleged, in our complaint, Your Honor, there

were conditions under which someone such as Nelson Shanks perhaps could have either been fooled, or just didn't have the ability to understand what was going on. And if the complaint is not clear enough, in that regard, we would ask to – the ability to amend it. But I think that it is clear, Your Honor, in which we state that the Halls took every opportunity to ingratiate themselves."); 32:6-13 ("[I]f we did not state this with particularity, we would ask the Court for leave to amend our complaint, because . . . there was – and we have, in some way, alleged that there was fraud involved, in the drafting of this complaint, in that the Halls ingratiated themselves to a man[] who had an alcohol problem.").

This is not a situation in which Plaintiff has alleged a claim for fraud in the first instance and seeks to add additional facts to bolster its fraud claim. Here, Plaintiff has not brought a claim for fraud and has maintained that it does not intend to bring a claim for fraud in this matter. *Id.* at 30:21-31-4 ("Let me be clear on this, Your Honor, we are not – this is not a claim for fraud. That we are not bringing a – a tort of fraud. What we are saying, in as Georgia law allows, that if a – there is a term of a contract, which has been left out, it can either – you can put it back in, if you can show that it was done either by fraud or mutual mistake. And that doesn't mean that it was a fraud in the inducement. And we are not seeking that, in this case, Your Honor.").

Therefore, any additional facts regarding Defendants ingratiating themselves with Shanks would be used only to introduce parole evidence to bolster Plaintiff's breach of contract claim. As stated previously, "[p]arol evidence is admissible to establish fraud in the inducement, even though there is an entirety or merger clause in the written contract, where the complaining party does not elect to stand on the contract but proceeds on fraud." *Judge v. Wellman*, 198 Ga. App. 782, 783 (1991). The Court has determined that the 2003 Agreement is unambiguous, and because Plaintiff does not intend to proceed on a claim for fraud, parol evidence is not admissible to establish fraud in the inducement. Therefore, amendment to state additional facts showing how Defendants ingratiated themselves to Shanks would not save Plaintiff's breach of contract claim.

Furthermore, even if Plaintiff were to amend the Complaint to add a claim for fraud, Plaintiff has not alleged, nor has proposed alleging, any additional facts that would persuade the Court there was any fraud involved in the signing of this contract.[9] Alleging that Defendants ingratiated themselves to an alcoholic does not state a claim for fraud. Plaintiff has never stated that Shanks was "deprived of an

---

[9] Defendants filed their Motion to Dismiss in October 2018. ECF No. 6. The parties held settlement conferences with Magistrate Judge Rueter on five different occasions to attempt to settle this matter but were unable to settle. ECF Nos. 16, 18, 25, 27, 28. The Court has allowed the parties eight months to resolve this matter, and, as there is no reason to believe amendment of the Complaint would salvage Plaintiff's breach of contract claim, dismissal with prejudice is proper.

22

opportunity to read the [2003] [A]greement[]," nor has Plaintiff alleged that there was any "active concealment [or] negligent misrepresentation" in the signing of the 2003 agreement. *Novare Grp., Inc. v. Sarif*, 290 Ga. 186, 189-190 (2011) (stating the elements for fraud in the inducement). Therefore, amendment of the Complaint would be futile, and the Complaint is dismissed with prejudice.

## V.    CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss (ECF No. 6) is granted. The Complaint is dismissed with prejudice.

**BY THE COURT:**

DATE: __6-21-2019__

**CHAD F. KENNEY, JUDGE**